## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA and** | ) | |
| **PEOPLE OF THE VIRGIN ISLANDS,** | ) | |
| | ) | **Criminal Action No. 2015-0028** |
| **v.** | ) | |
| | ) | |
| **GERARD ST. ROSE, JR.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**Attorneys:**
**Alphonso G. Andrews, Esq.,**
St. Croix, U.S.V.I.
    *For the Government*

**Omodare B. Jupiter, Esq.**,
St. Croix, U.S.V.I.
    *For Defendant*

## <u>MEMORANDUM OPINION</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Gerard St. Rose, Jr.'s "Motion to Suppress Statements and Physical Evidence." (Dkt. No. 11; 15-cr-0022, Dkt. No. 25).[1] The Government opposes the Motion. (Dkt. No. 17; 15-cr-0022, Dkt. No. 28). For the reasons discussed below, the Court will grant the Motion to Suppress.

## I.  BACKGROUND AND EVIDENCE

Defendant Gerard St. Rose, Jr. ("St. Rose") was indicted on September 15, 2015, on the following six charges: (1) Possession of a Firearm in a School Zone, in violation of 18 U.S.C. §§ 922(q)(2)(A) and 924(a)(1)(B); (2) Unauthorized Possession of a Firearm, in violation of 14

---

[1] The initial Motion to Suppress and Government Response were filed in case number 15-cr-0022, which was initiated by Information. Following the filing of an Indictment, which initiated the instant matter, the Information was dismissed upon motion of the Government. Unless otherwise indicated, citations are to 15-cr-0028.

V.I.C. § 2253(a); (3) Carrying Firearm During and in Relation to Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A); (4) Possession of Marijuana with Intent to Distribute, in violation of 21 U.S.C. §§ 841(a) and 841 (b)(1)(D); (5) Possession of Marijuana Near a School, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(D), and 860(a); and (6) Simple Possession of Marijuana, in violation of 21 U.S.C. § 844(a). (Dkt. No. 1).

On October 2, 2015, St. Rose filed the instant Motion in which he seeks to suppress "any and all physical evidence found on the Defendant or in his bag, the Defendant's statements, and any other incriminating evidence obtained as a result thereof" on the grounds that the evidence was obtained as a result of an illegal seizure in violation of his Fourth Amendment rights. (Dkt. No. 11 at 8).[2] The Government filed its Response on November 3, 2015, in which it argued to the contrary. (Dkt. No. 17). An evidentiary hearing was held on November 9, 2015 (the "November Evidentiary Hearing"), at which Virgin Islands Police Department Officers Anderson Poleon and Nyeim France testified.

After the November Evidentiary Hearing, St. Rose filed a "Motion to Reopen Testimony" on December 15, 2015, in order to call Shanavia Martin as a witness. (Dkt. No. 30). Ms. Martin is the Acting Emergency Communications Center Manager for the Virgin Islands Territorial Emergency Management Agency (VITEMA) and was familiar with the 911 calls made on the day of the incident. (*Id.* at 6-7). The Court granted the Motion and a second evidentiary hearing was held on January 7, 2016 (the "January Evidentiary Hearing"), at which Ms. Martin testified. Following this second evidentiary hearing and pursuant to St. Rose's request, the Court ordered the parties to file supplemental briefing. (Dkt. No. 35). St. Rose filed his "Corrected Memorandum

---

[2] St. Rose's arguments for why the evidence should be suppressed have expanded since his initial Motion and now include a claim that the evidence was obtained in violation of the Fifth Amendment. (*See* Dkt. No. 42 at 29).

in Support of Defendant's Motion to Suppress Statements and Physical Evidence" on January 21, 2016 (the "Supplemental Memorandum") (Dkt. No. 42), and the Government filed its "Supplemental Response to Defendant's Motion to Suppress (Doc. No. 42)" on February 1, 2016 (the "Supplemental Response") (Dkt. No. 45). Based on the evidence presented at the November Evidentiary Hearing and the January Evidentiary Hearing, the following facts emerge.[3]

Around 1:00 p.m. on April 20, 2015, Officer Poleon and Officer France were traveling east on Mt. Pleasant Road in a patrol car when Officer France—who was in the passenger seat—alerted Officer Poleon to a maroon car that was traveling in the opposite direction. (Transcript of Evidentiary Hearing (Dkt. No. 31) ("Tr.") 6-7). Officer France noted that he had previously stopped the maroon car for having an outdated registration. (Tr. 6-7). Upon hearing this, Officer Poleon turned on his patrol lights and the maroon car stopped. (Tr. 7).[4] When both cars had stopped, they were adjacent to each other in the middle of the road. (Tr. 7-8). Officer Poleon rolled down the passenger-side window, and the driver of the maroon car, Mr. James, and Officer France began to talk about the car's registration. (Tr. 7). After Mr. James indicated that he had not yet updated the car's registration, Officer Poleon got out of the patrol vehicle, walked around to the passenger side of the maroon car, and stood between the two vehicles. (Tr. 8). Officer France also got out of the patrol car and went around to the driver's side of the maroon car to talk with Mr. James. (Tr. 8). After Officer Poleon learned that Mr. James had been stopped multiple times for

---

[3] The Court bases the background factual discussion in this section on the record established at the evidentiary hearings. The Court provides this information solely for the purpose of this pretrial motion, ever mindful that St. Rose is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

[4] Officer Poleon testified that he stopped the vehicle after Officer France said that he recognized it for previous registration violations. (Tr. 6-7). According to Officer France's testimony, Officer France told Officer Poleon to stop the car after he recognized the vehicle from a previous stop and saw that the windshield registration was still outdated. (Tr. 64).

the outdated registration, he told Mr. James that he was going to tow his car. (Tr. 8-9). Officer Poleon testified that he announced his decision to tow the maroon car approximately ten minutes after the initial stop. (Tr. 10).

Mr. James got out of the car and walked around to his car's front bumper to plead with Officer France and Officer Poleon not to tow the car. (Tr. 10). At this time, Officer Poleon was standing near the middle of the road between the unregistered car and the patrol vehicle, close to the passenger-side door of the unregistered car where Defendant St. Rose was sitting. (Tr. 8-9). Officer Poleon instructed St. Rose to get out of the car because the vehicle was going to be towed, and St. Rose got out and stood next to Officer Poleon. (Tr. 10-11). Officer Poleon then asked Mr. James if there was anything in the vehicle that he needed to remove. (Tr. 11). Mr. James replied that the only thing he had in the vehicle was his clothes, but that he did not have anything in which to put the clothes. (Tr. 11).

Officer Poleon then turned back to St. Rose, who was shaking, sweating, and looked very nervous. (Tr. 11-12). Officer Poleon asked St. Rose if he was ok, and St. Rose responded, "I do not like police." (Tr. 12). Officer Poleon became nervous and stepped back away from St. Rose and asked what he meant. (Tr. 12). St. Rose responded again, "I just don't like police." (Tr. 12). Officer Poleon then asked St. Rose if he had anything on him that could hurt the Officers, and whether he would mind if Officer Poleon patted him down. (Tr. 13-14). In response, St. Rose put his hands in the air and said "no problem." (Tr. 14).[5] This occurred approximately 15 minutes after the initial stop. (Tr. 18).

---

[5] According to Officer France, Officer Poleon initially asked St. Rose why he was moving like that; if there was anything wrong with him; and whether he had anything on him. (Tr. 67). When St. Rose responded with "No, I just don't like police," Officer Poleon asked him whether he had anything illegal on him and St. Rose responded by saying "you could go ahead and check me," and raising his arms in the air. (Tr. 67).

4

During the pat down, Officer Poleon felt what appeared to be the butt of a weapon. (Tr. 14). Officer Poleon yelled, "gun!" and pulled his weapon. (Tr. 14). According to Officer Poleon, Officer France, who was still talking with Mr. James near the front of the car about the registration violation, also drew his weapon. (Tr. 14). As a result, Officer Poleon and Officer France were facing each other with their guns drawn, so Officer France stepped off to the side of Officer Poleon and ordered St. Rose to keep his hands up. (Tr. 14).[6] Officer Poleon further testified that "[St. Rose] was handcuffed, and I asked him . . . 'Do you have a license for this weapon?' And he said 'no,' and . . . I advised him of his rights." (Tr. 14).[7] St. Rose then stated that he had gotten the gun because he had recently been robbed and did not want to get robbed again, and he also told the Officers other details about how and when he acquired the weapon. (Tr. 14-15).

The Officers called 911 to advise that they had someone in custody and that a weapon had been recovered, as well as to request a forensic unit. (Tr. 16). Officer Poleon later asked St. Rose if he had anything else on his person that could hurt the Officers. (Tr. 17). St. Rose stated that the only thing he had was a dime bag in his pocket and some weed in a blue bag in the car. (Tr. 17-18). Officer France then retrieved the blue bag from the car and asked St. Rose, "[t]his is the blue

---

[6] Officer France testified that immediately after the gun was discovered, he ordered St. Rose to the ground where he remained until he was handcuffed. (Tr. 68-69).

[7] There are differing accounts as to the exact sequence of these events. The Government Response brief initially states that after Officer Poleon felt the gun, "[h]e pulled his weapon, instructed St. Rose to put his hands in the air, and inquired whether St. Rose had a firearm license. St. Rose said, 'no' and [Officer] Poleon handcuffed him and advised him of his rights." (Dkt. No. 28 at 2). This is consistent with Officer Poleon's Offense Report, which notes that after discovering St. Rose's gun, Officer Poleon drew his weapon and "asked [St. Rose] if he had a license to carry the gun in this territory and he said 'no officer.' [Officer Poleon] handcuffed [St. Rose] and advised him of his Miranda Warnings." (Defense Exh. 2 at 3). However, the Government Response brief subsequently states that "[w]ith his consent a pat down ensued, the police observed a firearm in St. Rose's waist and yelled, 'gun.' They drew weapons, placed handcuffs on him and advised him of his rights. . . . The police was [sic] now authorized to conduct a brief investigation and did so by first inquiring whether St. Rose had a firearm license." (*Id.* at 5).

bag that you were talking about?" to which St. Rose responded "yes." (Tr. 70). Officer France proceeded to open the bag and discovered, among other things, baggies and a jar containing marijuana. (Tr. 70).

The forensic officer arrived and took photographs of the gun, which the Officers had left on St. Rose so that it could be photographed in his possession. (Tr. 17, 69-70). In preparation for putting St. Rose in the transport unit, Officer Poleon again patted him down and this time discovered a small plastic bag containing marijuana in the cuff of his pants as well as a plastic vial of marijuana in his pocket. (Tr. 17-18).

The vehicle was eventually towed. (Tr. 19). Officer Poleon testified that police policy mandates that "[w]hen you're going to tow the vehicle, you are to do an inventory of what's in it." (Tr. 22). When asked on direct examination whether this involves "searching" the vehicle, Officer Poleon responded by stating that the policy did not require "searching the vehicle, just visually inspecting the trunk, visually inspecting . . . where the passengers sit [in] the vehicle." (Tr. 22). Officer Poleon testified that he conducted an inventory search of the car but—in violation of the policy—did not document the results of the inventory. (Tr. 52-53). Officer Poleon also testified that there was nothing of value in the car. (Tr. 21).

## II.   DISCUSSION

As previously noted, St. Rose seeks to suppress "any and all physical evidence found on the Defendant or in his bag, the Defendant's statements, and any other incriminating evidence obtained as a result thereof." (Dkt. No. 11 at 8). This includes the gun and marijuana found on St. Rose's person as well as the marijuana and paraphernalia found in the blue bag in the car. The Government maintains, on the other hand, that the physical evidence was obtained as a result of a consensual search, and that St. Rose's statements are admissible either because they were not made

in the context of a custodial interrogation, or were made after St. Rose received his *Miranda* warnings. (Dkt. No. 28 at 4-5).

This case raises several significant factual and legal issues. St. Rose presents challenges to several events that occurred during the incident, and in so doing has caused the Court to consider, among other things: whether the initial stop of the vehicle was valid; whether the Officers unlawfully prolonged the duration of the traffic stop as to St. Rose by not telling him he was free to leave; whether St. Rose consented to a pat down search and, if so, whether such consent was an involuntary submission to a claim of lawful authority; whether the Officers had lawful authority to draw their weapons and handcuff St. Rose after discovering the gun, but before learning that the gun was possessed illegally; whether St. Rose's *Miranda* rights were violated; and whether St. Rose's statements were obtained involuntarily and, if so, the applicability of the exclusionary rule. The record contains over 250 pages of transcript from the November Evidentiary Hearing and the January Evidentiary Hearing as well as several exhibits. Moreover, as St. Rose argues in the first 15 pages of his Supplemental Memorandum, the record is replete with alleged inconsistencies. (Dkt. No. 42 at 2-16).

In any event, after a thorough review of the record and the significant factual and legal questions presented therein, the Court concludes that it need not reach a decision on each issue. Even assuming—without deciding—that all of the issues up through the search of St. Rose are resolved in favor of the Government, the Court finds that the challenged evidence must be suppressed because it was the fruit of an involuntary statement. Specifically, the Court finds that when the Officers pointed their weapons at St. Rose and asked him whether he had a license for his gun without advising him of his rights, St. Rose's response was the involuntary product of police coercion. As set forth below, because St. Rose's response that he did not have a firearms

7

license was obtained involuntarily, his Fifth Amendment rights were violated, and the exclusionary rule requires suppression of the statements and physical evidence derived from St. Rose's response.

### A.      St. Rose's Statement and Subsequent Arrest

At some point after Officer Poleon and Officer France stopped the car, Officer Poleon instructed St. Rose to exit the car. (Tr. 10-11). Allegedly with St. Rose's consent, Officer Poleon conducted a pat down search and felt what he believed to be a gun on St. Rose. (Tr. 14). Officer Poleon then yelled "gun" to alert Officer France to the presence of a gun. (Tr. 14). The Officers drew their weapons, possibly ordered St. Rose to the ground, and handcuffed him. (Tr. 14, 68). [8] Without advising St. Rose of his *Miranda* rights, Officer Poleon then asked St. Rose whether he had a firearms license, and he responded "no." (Tr. 14). Under the circumstances here, the Court concludes that St. Rose's response was involuntary.

### 1. Applicable Legal Standards

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court established the now well-recognized legal principle that under the Fifth Amendment the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. *Miranda* warnings are required when a suspect is "(1) 'in custody' and (2) subject to 'interrogation' by the [g]overnment." *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion) (internal citations omitted). A suspect is "in custody" when "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting

---

[8] As discussed below, the record contains different versions of the sequence of events that transpired after Officer Poleon felt the gun.

*California v. Beheler*, 463 U.S. 1121, 1125 (1983)) (quotations omitted). "This determination is objective, based on 'how a reasonable man in the suspect's position would have understood his situation.'" *United States v. May*, 87 F. App'x 223, 227 (3d Cir. 2003) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). "For a person to be in custody when he has not been arrested, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.'" *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006) (quoting *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974)). An "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

A person may, however, "waive effectuation of these [*Miranda*] rights, provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444; *see also United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005). "Once a defendant challenges the admissibility of any statements made while in custody, the government must prove [by a preponderance of the evidence] that the defendant was advised of and understood [his] *Miranda* rights and that he . . . validly waived those rights." *United States v. Briscoe*, 69 F. Supp. 2d 738, 741 (D.V.I. 1999), *aff'd in part, rev'd in part on other grounds*, 234 F.3d 1266 (3d Cir. 2000); *see also Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986).

To prove a valid waiver, the Government has the burden of establishing that the waiver was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness both of the nature of the

9

right being abandoned and the consequences of the decision to abandon it." *Pruden*, 398 F.3d at 246 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *see also United States v. Whiteford*, 676 F.3d 348, 362 (3d Cir. 2012). The Supreme Court has characterized this as a "heavy burden." *Miranda*, 384 U.S. at 475; *see also North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (stating that "the prosecution's burden is great").

To determine whether *Miranda* rights have been voluntarily, knowingly, and intelligently waived, courts must "consider the totality of circumstances surrounding [the defendant's] statement." *Briscoe*, 69 F. Supp. 2d at 741 (quoting *United States v. Tyler*, 164 F.3d 150, 158 (3d Cir. 1998)) (quotations omitted). Specifically, courts must consider "the background, experience, and conduct of the [defendant], as well as any indicia of coercion." *Id*. (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983)) (internal citations omitted). Examples of "traditional" indicia of coercion are the duration and conditions of detention, the attitude of the interrogators, defendant's physical and mental state, and other pressures affecting his powers of resistance and self-control. *Id*. at 741 n.1.

A violation of *Miranda* does not necessarily trigger the exclusionary rule such that all evidence derived from an unmirandized statement must be suppressed. As stated in the plurality opinion in *United States v. Patane*, 542 U.S. 630 (2004):

> [T]he *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause. . . . [T]he core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial. . . . The Clause cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements.

*Id.* 636-37 (Thomas, J., plurality opinion). In other words, courts have rejected the proposition that "the 'fruit of the poisonous tree' doctrine, which in the fourth amendment context requires the exclusion of evidence or confessions obtained as a result of a constitutional violation, extends to

violations of the *Miranda* decision." *United States v. DeSumma*, 272 F.3d 176, 180 (3d Cir. 2001) (quoting *United States v. Johnson*, 816 F.2d 918, 922 (3d Cir. 1987)) (quotations omitted) (holding that the gun that police recovered as a result of voluntary statements obtained in violation of the *Miranda* rule was properly admissible).

However, the exclusionary rule will apply to suppress evidence that is derived from statements that are not only obtained in violation of the *Miranda* rule but are also obtained involuntarily. *See United States v. Jacobs*, 431 F.3d 99, 109 n.11 (3d Cir. 2005) ("While statements made by a defendant in circumstances violating . . . *Miranda* . . . are admissible for impeachment if their trustworthiness . . . satisfies legal standards, . . . *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law. . . ." (quoting *Mincey v. Arizona*, 437 U.S. 385, 397-98, (1978))) (quotations omitted) (emphasis in original). As noted in dicta in the plurality opinion in *Chavez v. Martinez*, 538 U.S. 760 (2003): "our cases provide that those subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial." *Id.* at 769 (Thomas, J., plurality opinion) (emphasis in original); *see also United States v. Conley*, 859 F. Supp. 847, 851 (W.D. Pa. 1994) ("Because the Court suppressed [defendant's] statements on the basis that they were involuntary, coerced statements . . . the Court must determine what part of the Government's case, in addition to the coerced statements themselves, is 'fruit of the poisonous tree.'") (internal citations omitted); *cf. DeSumma*, 272 F.3d at 180 ("We hold that the fruit of the poisonous tree doctrine does not apply to derivative evidence secured *as a result of a voluntary statement* obtained before *Miranda* warnings are issued.") (emphasis added).

Where a statement is obtained involuntarily, courts have consistently applied the fruit of the poisonous tree doctrine and its exceptions to determine whether the fruits of such statements

should be suppressed. *See, e.g.*, *United States v. Downing*, 665 F.2d 404, 409 (1st Cir. 1981) (noting the "unavoidable coerciveness of police questioning after an accused has requested the presence of counsel," and holding that "any evidence obtained as a result of violating appellee's Fifth Amendment right to have counsel present during interrogation cannot be introduced against him at trial"); *United States v. Brookins*, 614 F.2d 1037, 1041-42 (5th Cir. 1980) (noting that "[t]he exclusionary rule bars evidentiary 'fruit' obtained 'as a direct result' of an illegal search or an illegal coercive interrogation" but admitting evidence derived from involuntary statements based on the inevitable discovery exception.); *Gov't of Virgin Islands v. Gereau*, 502 F.2d 914, 927-28 (3d Cir. 1974) (holding that a gun—the location of which was disclosed in a statement illegally obtained after defendant's request for an attorney was ignored—did not need to be suppressed because the government met its burden of showing "that the [gun] was not the 'fruit of the poisonous tree'") *abrogated on other grounds by Corley v. United States*, 556 U.S. 303 (2009);[9] *Conley*, 859 F. Supp. at 851-53 (suppressing evidence derived from coerced statements); *United States ex rel. Monks v. Warden*, *New Jersey State Prison at Rahway*, 339 F. Supp. 30, 35 (D.N.J. 1972) (suppressing a jacket after finding that "[s]ince the confessions are involuntary, the jacket is a poisoned fruit of the prior coercive questioning which was not attenuated by intervening events"), *aff'd sub nom. United States ex rel. Monks v. Warden*, 474 F.2d 1337 (3d Cir. 1972); *see also Winsett v. Washington*, 130 F.3d 269, 280 (7th Cir. 1997) (noting in dicta that "[c]oerced, but accurate, confessions and their fruits are still excludable under the Fifth Amendment voluntariness standard").

---

[9] The underlying district court decision further notes that "[a]lthough the 'poisonous fruit' doctrine was first developed in the context of controlling illegal searches and seizures under the Fourth Amendment . . . . [i]t has also been applied, as the defendants would have me do here, to the fruits of involuntary confessions under the Fifth Amendment." *Gov't of Virgin Islands v. Gereau*, 1973 WL 354203, at *25 (D.V.I. July 23, 1973).

"[A] statement is involuntary when the suspect's will was overborne in such a way as to render his confession the product of coercion." *United States v. Latz*, 162 F. App'x 113, 118 (3d Cir. 2005) (quoting *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002)) (quotations omitted). Courts look to the totality of the circumstances to determine whether a statement was voluntary and consider "not only the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; education; physical condition; and mental health . . . [but also] the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation." *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994) (internal citations omitted) (quoting *Withrow v. Williams*, 507 U.S. 680, 694 (1993)). "A necessary predicate to a finding of involuntariness is coercive police activity. Further, there must be some causal connection between the police conduct and the confession." *Jacobs*, 431 F.3d at 108 (internal citation omitted). "The burden is on the Government to establish, by a preponderance of the evidence, that a challenged statement was voluntary." *Id.*

### 2. St. Rose's Statement Regarding the Absence of a Firearms License

The record is unclear as to the sequence of events that occurred immediately after Officer Poleon discovered the gun. According to Officer Poleon's testimony, after discovering the gun the Officers drew their weapons, handcuffed St. Rose, and then asked whether he had a firearms license. (Tr. 14). According to Officer Poleon's Offense Report, however, Officer Poleon drew his weapon, asked St. Rose about the firearms license, and then handcuffed him. (Defense Exh. 2 at 3).[10] While the two versions presented by Officer Poleon differ as to whether St. Rose was handcuffed when he responded, in both versions Officer Poleon asked St. Rose if he had a license

---

[10] Although not discussed in either Officer Poleon's testimony or his Offense Report, Officer France testified that, after discovery of the gun, St. Rose was ordered to the ground where he stayed until after he was handcuffed. (Tr. 68-69).

for the weapon and St. Rose responded "no" after the Officers' weapons were drawn and before Officer Poleon advised him of his *Miranda* rights.

Under either scenario, Officer Poleon's question as to whether St. Rose had a license for the gun is a custodial interrogation. St. Rose was in custody because there was a "restraint on freedom of movement of the degree associated with a formal arrest." *Leese*, 176 F.3d at 743 (quoting *Beheler*, 463 U.S. at 1125) (quotations omitted). Such restraint would be the natural consequences of being handcuffed because "[h]andcuffs are generally recognized as a hallmark of a formal arrest." *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) (holding that a defendant who was handcuffed was in custody for *Miranda* purposes).

Based on the evidence, the same result would obtain even if St. Rose was not handcuffed. The Offense Report states that Officer Poleon drew his weapon and advised St. Rose to put his hands in the air. (Defense Exh. 2 at 3). Officer France testified that after the Officers drew their weapons, Officer France ordered St. Rose to the ground. (Tr. 68-69). With guns drawn and orders being given to St. Rose by the Officers, the Court concludes that the circumstances would have caused a reasonable person in St. Rose's position to believe that the Officers "would not have heeded a request to depart or to allow [him] to do so." *Willaman*, 437 F.3d at 359 (quoting *Steigler*, 496 F.2d at 799) (quotations omitted).

Accordingly, the Court finds that St. Rose was in custody at the time of the inquiry although he had not yet been formally placed under arrest. The Court further finds that Officer Poleon's question was an interrogation because it was a direct inquiry regarding the legality of St. Rose's conduct, and therefore "intentionally designed to evoke a confession." *Bonner*, 469 F. App'x at 126. Further, Officer Poleon should have reasonably foreseen that his question would elicit an inculpatory response. *Id.*

14

This Court encountered a similar factual situation in *United States v. Jamil*, 2008 WL 687525, at *1 (D.V.I. Mar. 12, 2008) and reached the same conclusion. In *Jamil*, the officer grabbed the suspect, brought him to the ground, performed a pat down, and discovered and removed the suspect's firearm. *Id.* Before advising the suspect of his *Miranda* rights, the officer asked if he possessed a license for the firearm. *Id.* The Court found that the suspect's negative response was the result of a custodial interrogation and suppressed the statement. *Id.* at *2.

Here, as in *Jamil*, the Officers put St. Rose in custody for *Miranda* purposes and questioned him regarding the legality of his firearm, but did not advise him of his *Miranda* rights until after St. Rose responded that he did not have a license. Because St. Rose was subjected to a custodial interrogation without having been read his *Miranda* rights, his negative response to Officer Poleon's question was obtained in violation of *Miranda*.

The Government nonetheless maintains that Officer Poleon's interrogation was not a violation of *Miranda* because the Officers detained St. Rose only temporarily to investigate the legality of the gun. (Dkt. No. 45 at 13). Citing the Supreme Court's decision in *Berkemer v. McCarty*, the Government argues that individuals who are temporarily detained are not "in custody" for *Miranda* purposes. (*Id.*). The Court does not agree that the temporary detention principles apply under the circumstances here.

In *Berkemer*, the Supreme Court stated that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." 468 U.S. at 440. However, the Supreme Court rejected a bright-line rule that *Miranda* protections are never implicated during traffic stops or are implicated only after a formal arrest. *Id.* Instead, the Supreme Court noted:

> [T]he safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a "degree associated with formal arrest." If a

motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him "in custody" for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda.

*Id.* (internal citations omitted) (quoting *Beheler*, 463 U.S. at 1125).

Here, the Officers' actions with regard to St. Rose after the initial traffic stop rendered him in custody for purposes of *Miranda*. Drawing and aiming weapons at St. Rose, while either ordering him to raise his hands or to get on the ground, and possibly even applying handcuffs, are actions that go far beyond the degree of restraint associated with typical traffic stops. Even if the interaction began as simply a traffic stop, the Officers' subsequent actions placed St. Rose in custody for *Miranda* purposes as there was a restraint on his freedom to a "degree associated with formal arrest." *Id.*

The Court is similarly unpersuaded by the Government's alternative argument that a Virgin Islands statute removes St. Rose's response from the protections of *Miranda*. In its two-sentence analysis of the statute, the Government asserts that 23 V.I.C. §§ 488(a) and (b) authorized the Officers "to detain and question [St. Rose] based solely on their discovery of a firearm on his person." (Dkt. No. 45 at 14). However, in view of the well-established law in this area, the Government fails to explain how the statute can be interpreted to mean that an unmirandized interrogation into the legality of a firearm can take place—as here—in the context of a "restraint on [the individual's] freedom of movement of the degree associated with a formal arrest." *See Leese*, 176 F.3d at 743 (quoting *Beheler*, 463 U.S. at 1125) (quotations omitted). Nor could such an explanation be made, because the statute cannot, of course, be read so as to negate protections afforded by the U.S. Constitution. *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) (holding that "*Miranda* announced a constitutional rule that Congress may not supersede legislatively"). Thus, given the facts before the Court, the statute on which the Government relies

cannot be legitimately read to exempt St. Rose's response from the protections afforded by *Miranda* and does not, therefore, alter the Court's conclusion. St. Rose's statement that he did not have a firearms license will be suppressed.

### 3. Derivative Evidence

To determine whether the *Miranda* violation requires suppression of any derivative evidence, the Court must now determine whether St. Rose's response was also involuntary in violation of the Fifth Amendment. *See Jacobs*, 431 F.3d at 108; *DeSumma*, 272 F.3d at 179-81. The Court finds that the Government has failed to meet its burden of showing, by a preponderance of the evidence, that St. Rose's response to Officer Poleon's question was voluntary, and the evidence derived therefrom must therefore be suppressed.

The Government's failure to carry its burden is evident from certain salient facts. First, the fact that St. Rose was not advised of his *Miranda* warnings or otherwise informed of his right to remain silent until after he had responded to Officer Poleon's inquiry supports a finding of involuntariness. *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986) (noting that "the lack of any advice to the accused of his constitutional rights" is a factor to be considered in voluntariness determinations (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973))). Further—and more importantly—the record contains evidence that, at the time St. Rose was asked and responded to Officer Poleon's inquiry regarding the firearms license, both Officers were standing in close proximity to St. Rose and were pointing their weapons at him. (*See* Tr. 14; Defense Exh. 2 at 3). This evidence of coercion, which is a "crucial element" in a finding of involuntariness, was, at the very least, "causally related" to St. Rose's incriminating response. *Swint*, 15 F.3d at 289. The close proximity of the Officers when their weapons were drawn and the fact that St. Rose appeared "very nervous" even before his gun was discovered suggest that St. Rose made the incriminating statement in a coercive environment in which the Officers' conduct caused him to reasonably fear

physical harm. *See Cooper v. Scroggy*, 845 F.2d 1385, 1391-92 (6th Cir. 1988) (holding that a confession was involuntary in part because the defendant was likely aware that an officer had hit a co-defendant several hours before the confession and the defendant witnessed another officer verbally threaten the co-defendant: "we conclude that [the officer's] physical abuse of [the co-defendant] created a coercive environment in which [defendant] reasonably feared that he too was threatened with physical abuse"); *cf. United States v. Savage*, 2012 WL 5881852, at *6 (E.D. Pa. Nov. 20, 2012) (finding that statements made while handcuffed in back of police car were voluntary in part because there was no indication that defendant felt threatened); *United States v. Caple*, 2008 WL 5146556, at *5 (M.D. Pa. Dec. 8, 2008) (finding that statements made while on a couch during search of residence were voluntary in part because defendant acted calmly, joked with officers, and did not appear to be scared or threatened), *aff'd,* 403 F. App'x 656 (3d Cir. 2010).

The Court recognizes that the presence of drawn weapons does not necessarily mandate a finding of coercion. *See Latz*, 162 F. App'x. at 115; *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988) (holding that a defendant's statements, made while on the ground surrounded by officers with weapons drawn, were voluntary in part because there was "no evidence that the officers used these weapons in any way to force a 'confession' out of the [defendant]"). In *Latz*, the officer legally arrested the defendant at the entrance of his residence and conducted a limited search of the residence as a search incident to arrest. *Latz*, 162 F. App'x. at 115. The defendant was initially handcuffed on his porch in the presence of several officers and then moved to his couch while the police searched the residence. *Id.* at 115-16. While the defendant was handcuffed on his couch, an officer advised the defendant that he was not obligated to speak, but failed to give *Miranda* warnings before questioning him. *Id.* at 116. In holding that the defendant's responses were

voluntary despite the possible presence of a gun, the Third Circuit placed importance on the fact that the questioning officer never pointed the gun at the defendant or otherwise threatened him:

> [Officer] Kauffman, who did the questioning, may have been holding a shotgun. However, nothing suggests, and [defendant] does not contend, that Kauffman pointed the shotgun at [defendant] during the questioning. Furthermore, there is no evidence that [defendant] was threatened, and Kauffman told [defendant] that he did not have to talk. Under these circumstances, we cannot find that [defendant's] will was overborne.

*Id.* at 118. Similarly, in *McCall*, the Sixth Circuit supported its holding of voluntariness by noting that the defendant had been given his *Miranda* warnings before questioning, affirmatively responded that he understood his rights, and consistently made exculpatory statements in response to the interrogations. *McCall*, 863 F.2d at 460.

Unlike *Latz*, the record here *does* suggest that both Officers pointed their weapons at St. Rose.[11] Further, unlike the officers in *Latz* and in *McCall*, there is no evidence that either Officer Poleon or Officer France indicated to St. Rose in any way that he could choose to remain silent.

The Court finds that the facts of the present case are more aligned with those the Third Circuit considered in *Lam v. Kelchner*. In *Lam*, undercover officers posing as gang members verbally threatened Lam with violence in an attempt to obtain evidence of her involvement in a murder. 304 F.3d at 265. The officers confronted Lam at work and told her that they were there to collect the money she owed to the gang as payment for the murder. *Id.* at 260. Although Lam

---

[11] While the record is not explicit in this regard, this conclusion reasonably follows. The testimony was that both Officers drew their weapons (and Officer Poleon's Offense Report similarly states that he drew his weapon), and there is nothing to suggest that the weapons were kept in the "ready-low" position away from St. Rose. Indeed, both Officers testified that when Officer Poleon drew his weapon, Officer France—who was standing near the front of the car with the driver—quickly moved aside to remove himself from Officer Poleon's line of fire. Officer France specifically testified that after Officer Poleon alerted him to the presence of a gun he "veered out of the . . . line of fire" and drew his weapon. (Tr. 68). Officer Poleon testified: "I pulled my weapon, Officer [France] pulled his weapon and now . . . [Officer France] and I are facing each other with our guns drawn. So [Officer France] stepped off to my right . . . ." (Tr. 14).

denied being involved in the murder, the officers indicated that if the money was not eventually paid she would be killed. *Id.* In holding that Lam's resulting statements were involuntary, the Third Circuit noted that the officers directly threatened Lam with physical violence and that there was no evidence in the record to show that the defendant was impervious to such a threat. *Id.* at 265-66. In particular, the Third Circuit held that because the threats of physical violence and the fear they caused induced Lam's statements, the statements were involuntary. *Id.* at 268.

Similar to *Lam*, St. Rose was faced with a direct threat of physical violence when the Officers pointed their weapons at him, and there is nothing in the record to suggest that he was impervious to this threat or that this threat did not induce his response.[12] To the contrary, the record shows that St. Rose appeared "very nervous" even before this scenario transpired. Moreover, the threat of violence was obviously real because even Officer France deemed it necessary to "veer[] out of the . . . line of fire" when Officer Poleon drew his weapon. (Tr. 68). Given the totality of the circumstances, the Court finds that St. Rose did not have a rational option to remain silent but that his "will was overborne" in such a way as to make his incriminating statement involuntary. 304 F.3d at 264.[13]

---

[12] The fact that the threats in *Lam* were verbal whereas the threats here consisted of the Officers' actions does not render the analysis in *Lam* any less applicable. In both cases, the statements were made in response to a threat of physical violence. Indeed, even more than the verbal threats in *Lam*, which suggested that Lam would suffer *future* harm if she did not pay, 304 F.3d at 260, the actions of Officer Poleon and Officer France presented St. Rose with an immediate threat of physical violence.

[13] The Court notes that the Officers' conduct of drawing their weapons and restraining St. Rose is not *ipso facto* improper. During an investigatory *Terry* stop, "when an officer has a reasonable basis for 'believing that the individual is armed and presently dangerous,' [the officer] may 'take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.'" *United States v. Johnson*, 592 F.3d 442, 452 (3d Cir. 2010) (quoting *Terry v. Ohio*, 392 U.S. 1, 23 (1968)) (ellipsis omitted). In certain situations, "necessary measures" may include the use of handcuffs and weapons. However, soliciting an incriminating, pre-*Miranda* response from St. Rose while pointing their weapons at him in close proximity is a different matter,

In sum, the Court finds that St. Rose's statement regarding his lack of a firearms license was made in violation of *Miranda* and must be suppressed. Moreover, because St. Rose's response was involuntary, the exclusionary rule requires that the fruits of this involuntary statement be suppressed. *Conley*, 859 F. Supp. at 851; *cf. Gereau*, 502 F.2d at 928.

### 4. St. Rose's Arrest

After St. Rose responded that he did not have a firearms license, Officer Poleon advised St. Rose of his rights and arrested him.[14] The Government notes that it was St. Rose's "negative response [regarding the firearms license] that provided probable cause for his arrest." (Dkt. No. 28 at 5). However, illegally obtained evidence cannot serve as the basis for probable cause. *See Conley*, 859 F. Supp. at 853 (noting that evidence obtained pursuant to a search warrant may still be admissible if "the affidavit of probable cause is purged of all reference to [the involuntary statements] and is still found by the Court to contain adequate probable cause"). Accordingly, St. Rose's arrest is unlawful absent an exception to the exclusionary rule.

Despite the arguments proffered by St. Rose at the November Evidentiary Hearing that St. Rose's statement was illegally obtained and therefore the Officers lacked probable cause for the resulting arrest (Tr. 177-79), the Government failed to put forth any rebuttal arguments and evidence in support of the legality of the arrest.[15] To merit consideration by a court, parties are

---

and the Government has failed to meet its burden of establishing that this did not create a coercive environment.

[14] Although there is no evidence regarding the precise moment that the Officers formally arrested St. Rose, for purposes of the Court's analysis here, the Court considers that St. Rose was arrested when he was handcuffed and read his *Miranda* warnings.

[15] For example, argument and evidence to support the inevitable discovery or independent source doctrines as they relate to evidence establishing probable cause for the arrest were lacking. *See, e.g.*, *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998) (noting that the inevitable discovery doctrine applies when the Government establishes "that the police, following routine procedures, would inevitably have uncovered the evidence"); *United States v. Herrold*,

required to state their arguments "squarely and distinctly," or such arguments will be deemed waived. *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (quoting *Rivera–Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988))) (quotations omitted); *see also Dupree*, 617 F.3d at 729-30 (noting that because the government only argued that the initial police interaction did not constitute a seizure, it waived its argument that the exclusionary rule should not apply when the district court found the interaction to be an unlawful seizure); s*ee also Wolf v. Scobie*, 28 F. App'x 545, 547 (7th Cir. 2002) ("[P]erfunctory, undeveloped, and unsupported arguments are deemed waived (including arguments raising constitutional issues)."); *United States v. Valdes-de La Rosa*, 2009 WL 982624 at *1 (D.P.R. Apr. 7, 2009) (citing *Zannino*, 895 F.2d at 17 and noting that although the *Zannino* court "couche[d] this language as part of a 'settled appellate rule,' it is no less true at the trial level"). Accordingly, the Court finds that the Government waived any argument that, notwithstanding the illegality of St. Rose's statement regarding the firearms license, the subsequent arrest was legal.

In sum, because the Government has offered St. Rose's negative response regarding the possession of a firearms license as the only fact that establishes probable cause for St. Rose's arrest, any possible exception to the exclusionary rule has been waived and St. Rose's arrest and detention were unlawful.

### B.    Evidence Obtained Subsequent to St. Rose's Involuntary Statement

After St. Rose made his involuntary statement and was arrested, he made several incriminating statements, some of which led the Officers to the bag containing marijuana that was

---

962 F.2d 1131, 1140 (3d Cir. 1992) ("under the independent source doctrine, evidence that was *in fact* discovered lawfully, and not as a direct or indirect result of illegal activity, is admissible") (emphasis in original).

in the car. Also, St. Rose's statements led Officer Poleon to conduct a search of St. Rose's person, during which additional marijuana was discovered. The Court finds that the gun, St. Rose's incriminating statements, the bag containing marijuana, and the marijuana discovered on St. Rose's person must be suppressed.

### 1. Applicable Legal Standards

Generally, evidence obtained following a violation of a defendant's constitutional rights will be suppressed as "fruit of the poisonous tree." *United States v. Mosley*, 454 F.3d 249, 269 (3d Cir. 2006) (applying exclusionary rule based on illegal seizure in violation of the Fourth Amendment); *Conley*, 859 F. Supp. 851 (applying exclusionary rule based on involuntary, coerced statements obtained in violation of the Fifth Amendment). Such "fruits" include both statements made in the wake of an unconstitutional arrest, *Brown v. Illinois*, 422 U.S. 590, 605 (1975) (suppressing two voluntary statements as fruits of an illegal arrest), as well as physical evidence, *Mosley*, 454 F.3d at 269 (suppressing guns discovered pursuant to an illegal traffic stop). "[T]he scope of the exclusionary rule is determined by 'whether, granting establishment of the primary illegality, the evidence to which objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *United States v. Burton*, 288 F.3d 91, 99 (3d Cir. 2002) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)) (ellipsis omitted). When considering whether the taint of an initial illegality has been purged, courts focus on three non-dispositive factors: "(1) the temporal proximity between the unlawful conduct and the recovery of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the unlawfulness. The government shoulders the burden of establishing that suppression is unwarranted in light of these factors." *Dupree*, 617 F.3d at 739 (Fisher, J. concurring) (quoting *Brown*, 422 U.S. at 603-04) (quotations omitted); *see also Mosley*, 454 F.3d at 269 (noting that it is the Government's burden to establish "attenuation,

inevitable discovery, independent source, or some intervening act or event sufficient to purge the taint of the illegal stop").

### 2. Analysis

With the exception of the inventory search of the car, the Government has generally failed to raise any arguments as to how the evidence obtained after St. Rose's involuntary statement fall within exceptions to the exclusionary rule. As noted in *Dupree*:

> [D]istrict judges [are not required] to anticipate and join arguments that are never raised by the parties. *See United States v. Griffiths*, 47 F.3d 74, 77 (2d Cir. 1995). Instead courts rely on the litigants not only to cite relevant precedents, but also to frame the issues for decision. *See id*. ("The government was required to offer some argument or development of its theory. It failed to do so, and has therefore waived the issue.").

*Dupree*, 617 F.3d at 728. Except for the inventory search of the car, the Court finds that the Government has waived its arguments regarding the inapplicability of the exclusionary rule.

Even assuming the Government has not waived its arguments, the Court finds that suppression is warranted as to the gun found on St. Rose and the marijuana found on St. Rose and in the car because such evidence is the fruit of St. Rose's involuntary statement and unlawful arrest. Although St. Rose's subsequent statements also appear to be the fruit of St. Rose's involuntary statement and unlawful arrest, the Court finds that these statements must be excluded because they were obtained in violation of *Miranda*. The Court examines each piece of evidence in turn.

### a)      The gun

The Court finds that the gun, the seizure of which occurred after St. Rose gave his involuntary statement and was unlawfully arrested,[16] must be suppressed. Although the Court has

---

[16] The Officers elected to leave the gun on St. Rose's person so that the forensic unit could photograph it as it was discovered on him. Thus, the exact timing of the gun's physical seizure is unclear. However, even if the gun was not physically seized until St. Rose was transported away from the scene, the Court's analysis would remain the same.

assumed—without deciding—that Officer Poleon legally discovered the gun, the mere fact that a person possesses a gun in the Virgin Islands is not sufficient to establish probable cause of criminal activity. *See United States v. Ubiles*, 224 F.3d 213, 218 (3d Cir. 2000). Thus, even assuming that Officer Poleon's conduct in discovering the gun on St. Rose's person was legal, the mere possession of the gun by St. Rose would not, by itself, provide sufficient cause for its seizure. However, the Government points to no other basis upon which the Officers concluded that there was sufficient cause to seize the gun except for St. Rose's illegally obtained statement that he did not possess a license to carry the firearm.[17] *See Burton*, 288 F.3d at 100 (noting that to conduct a warrantless seizure of personal property there generally must be "a showing of both probable cause and exigent circumstances"). Thus, the seizure of the gun is integrally related to the involuntary statement. Moreover, the Government has failed to put forth any evidentiary support or argument sufficient to raise a colorable claim of the applicability of any exception to the exclusionary rule.

In short, there was close proximity between the illegally obtained statement and the seizure of the gun, and the Government has failed to point to any intervening circumstances that would purge the taint of the initial illegality. Further, under the particular circumstances here, eliciting an incriminating statement from St. Rose with weapons drawn and without having read St. Rose his *Miranda* warnings, is conduct that must be deterred. Accordingly, the Court finds that the seizure of the gun was a direct result of St. Rose's involuntary statement and unlawful arrest and that it must, therefore, be suppressed.

---

[17] In certain situations, police may briefly seize personal property where there is sufficient reasonable suspicion of criminal activity. *United States v. Frost*, 999 F.2d 737, 740 (3d Cir. 1993) (regarding temporary seizure of luggage). The Government does not contend that this is the case regarding St. Rose's gun.

### b)    St. Rose's post-*Miranda* statements

Officer Poleon testified that after St. Rose was placed in handcuffs and responded "no" to the inquiry regarding a firearms license, "I advised him of his rights." (Tr. 14). Similarly, Officer Poleon's Offense Report states that after St. Rose was placed in handcuffs, Officer Poleon "advised him of his Miranda Warnings." (Defense Exh. 2 at 3).

St. Rose made several incriminating statements after Officer Poleon advised St. Rose of his *Miranda* rights. First, Officer Poleon testified that St. Rose said that the reason he got the gun is that "he got robbed, and he just didn't want to get robbed again." (Tr. 15). Officer Poleon asked whether St. Rose made a report when he got robbed, and St. Rose responded "no." (Tr. 14). Officer Poleon asked St. Rose when he got robbed, and St. Rose replied "about agriculture time, he found a weapon, so instead of turning it in, he decided to keep it." (Tr. 14). When asked on direct examination, Officer Poleon testified that this statement was made by St. Rose in response to "us finding the gun and me asking him in reference to him having a license for it. So he was giving a reason why he had the weapon." (Tr. 15). Officer Poleon also asked St. Rose "[d]o you have anything else on you that could hurt me?" (Tr. 17). St. Rose responded that "[t]he only thing [he had was] a dime bag in [his] pocket and that's about it . . . [and] some weed in the car." (Tr. 17). At another point in his testimony, Officer Poleon testified that St. Rose stated "there is a blue bag in the rear passenger seat, it has a little bit of marijuana in it." (Tr. 18).[18]

Regarding the conversation between Officer Poleon and St. Rose, Officer France testified that Officer Poleon asked St. Rose "if he [had] anything on him, or . . . in the vehicle." (Tr. 70). According to Officer France, St. Rose responded "yeah, he got a dime bag or something on his person" and "a blue bag with a little bit of weed in [it]." (Tr. 70). Officer France testified that he

---

[18] Officer Poleon's testimony does not address the question that St. Rose was answering when he made this response. (Tr. 18).

retrieved the blue bag from the vehicle, and asked St. Rose "[t]his is the blue bag that you were talking about?" (Tr. 70). St. Rose responded "[y]es." (Tr. 70).

Because St. Rose seeks suppression of all of his statements, "the government must prove [by a preponderance of the evidence] that the defendant was advised of and understood [his] *Miranda* rights and that he . . . validly waived those rights." *Briscoe*, 69 F. Supp. 2d at 741.[19] Although this is the Government's burden, a waiver of *Miranda* rights need not be express. *Butler*, 441 U.S. 375-76. However, the Supreme Court has noted that a mere showing that a suspect was advised of his or her *Miranda* rights is insufficient to meet the government's burden: "If the State establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate 'a valid waiver' of *Miranda* rights. The prosecution must make the additional showing that the accused understood these rights." *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) (internal citations omitted). In other words, where no evidence is offered and admitted showing that a suspect "knowingly and intelligently waived his rights before making the inculpatory statement[,]" the prosecution fails to meet its burden of proving a valid waiver. *Tague v. Louisiana*, 444 U.S. 469, 471 (1980).

The record here is devoid of any evidence establishing that St. Rose understood his *Miranda* rights. The Government has simply established that Officer Poleon advised St. Rose of his *Miranda* rights but has not addressed whether St. Rose's subsequent alleged waiver was knowing and intelligent. Accordingly, the Court finds that the Government has failed to meet its burden of proving that St. Rose validly waived his *Miranda* rights. Thus, all of St. Rose's

---

[19] St. Rose argued at the November Suppression Hearing that St. Rose's statements should be suppressed, *inter alia*, "because there [was] no indication that [St. Rose] waived his [*Miranda*] rights." (Tr. 175-76). The Government did not address this issue in its subsequent Supplemental Response. (Dkt. No. 45).

statements made in response to a custodial interrogation must be suppressed pursuant to *Miranda*.[20] The Court now examines each statement in turn.

St. Rose's statements describing why he had the gun, when he obtained the gun, and the manner in which he obtained it were made in the context of a custodial interrogation. Regarding St. Rose's statement that he obtained the weapon because "he got robbed, and he just didn't want to get robbed again," the Government argues in its brief that this statement was made "without prompting" and is therefore outside of the *Miranda* rule. (Dkt. No. 17 at 5-6). However, when asked on direct examination what the statements were in response to, Officer Poleon testified that St. Rose made these in response to the discovery of the gun and his inquiry about whether St. Rose had a firearms license. (Tr. 14).

Spontaneous statements made "without prompting" are not implicated by *Miranda* because they are not a product of custodial interrogation. *See United States v. Young*, 233 F. App'x 114, 115 (3d Cir. 2007) (holding that a suspect's incriminating statements made immediately after police informed him of the crimes he was being charged with were spontaneous and not a result of custodial interrogation) (citing *McGowan v. Miller*, 109 F.3d 1168, 1170-71, 1175 (7th Cir. 1997); *United States v. Taylor*, 985 F.2d 3, 6-8 (1st Cir. 1993); *United States v. Jackson*, 863 F.2d 1168, 1172 (4th Cir. 1989)). However, given Officer Poleon's testimony that St. Rose began talking about the robbery in response to Officer Poleon's earlier question, the Court cannot find that St. Rose's response was "spontaneous." Rather, St. Rose made these statements at least partly in response to Officer Poleon's earlier question, which was designed to evoke a confession and which Officer Poleon should reasonably have foreseen would elicit an incriminating response.

---

[20] As noted above, although these incriminating statements also appear to be the fruits of St. Rose's involuntary statement, the Court need not reach the issue of whether the exclusionary rule requires their suppression because it finds that the statements are excluded pursuant to *Miranda*.

Accordingly, St. Rose's statement that he obtained the gun because "he got robbed, and he just didn't want to get robbed again" must be suppressed as it was a product of a custodial interrogation, and the Government has not carried its burden of showing a knowing waiver of St. Rose's *Miranda* rights. Similarly, St. Rose's responses to Officer Poleon's follow-up questions about the robbery (that St. Rose found the gun "about agriculture time . . . so instead of turning it in, he decided to keep it") must be suppressed for the same reason.

Likewise, St. Rose's response to both Officer Poleon's question regarding whether he had anything else on him or in the car and Officer France's question regarding the identification of the blue bag were also a product of a custodial interrogation.[21] St. Rose was still in handcuffs at this time and was directly responding to the Officers' questions, all of which were designed to evoke a confession and which the Officers should have reasonably foreseen would elicit an incriminating response. Further, the Government has not established that there was a knowing waiver of St. Rose's *Miranda* rights. Accordingly, the Court finds that suppression is necessary for St. Rose's statements that "[t]he only thing [he had was] a dime bag in [his] pocket and . . . some weed in the car"; St. Rose's description of the bag ("there is a blue bag in the rear passenger seat, it has a little bit of marijuana in it"); and St. Rose's positive response to Officer France's question: "[t]his is the blue bag that you were talking about?"

### c)    The bag containing marijuana

After St. Rose made the involuntary statement regarding possession of a firearms license and was arrested, St. Rose indicated to the Officers that he had a blue bag in the car containing marijuana. Because the discovery of the blue bag was a fruit of St. Rose's involuntary statement

---

[21] In its Response brief, the Government concedes this fact. (Dkt. No. 17 at 6.)

and illegal arrest and no exceptions to the exclusionary rule apply, the Court finds that the blue bag and its contents must be suppressed.

The record shows that the discovery of the blue bag happened in sufficiently close proximity to St. Rose's involuntary statement and illegal arrest that the taint of the illegality was not purged. After the Officers arrested St. Rose, there was a conversation about when and why St. Rose acquired the gun; the Officers radioed 911 to advise them of the situation and request a forensic unit; one of the Officers moved the patrol car to the side of the road; and the blue bag and its contents were discovered. (Tr. 16-18). There is no indication that any of these events required a significant amount of time or that there was ever a substantial gap in time between the events. Moreover, the Call History Record indicates that the gun was discovered around 1:05 p.m. and Officer Poleon and Officer France left the scene at 4:16 p.m. (Defense Exh. 6(a)). Thus, it appears that, at worst, the discovery of the bag and its contents occurred no more than three and a half hours after the Officers' illegal conduct. This timeframe does not suggest that the taint of the illegal conduct had dissipated prior to the discovery of the bag. *See United States v. Butts*, 704 F.2d 701, 705 (3d Cir. 1983) (suppressing a confession that was made "fewer than four hours" after an illegal arrest); *United States v. Marc*, 1997 WL 129324, at *8 (D. Del. Mar. 18, 1997) (suppressing statement made ten hours after illegal stop).

Moreover, there is no evidence of intervening circumstances between the illegal conduct and the bag's discovery sufficient to purge the taint of the initial illegality. Throughout the sequence of events, St. Rose remained in handcuffs at the scene of the traffic stop and was in the presence of both Officers. Although he was given his *Miranda* warnings, there is no evidence that St. Rose knowingly waived his rights.[22]

---

[22] Even a valid wavier of *Miranda* rights is not a per se cure for a prior constitutional violation.

Because of the close temporal proximity to the misconduct and the lack of intervening circumstances, "the totality of the circumstances establishes that the initial violation was integrally related" to the subsequent discovery of the bag. *United States v. Howard*, 210 F. Supp. 2d 503, 520 (D. Del. 2002) (suppressing physical evidence and voluntarily made inculpatory statements because they were "integrally related" to an earlier violation of the defendant's Fourth Amendment rights). Accordingly, the Court finds that the Government has failed to meet its burden of showing that the discovery of the bag is not a fruit of St. Rose's involuntary statement.

At the November Evidentiary Hearing, the Government argued that regardless of St. Rose's statements, the bag and its contents would have been inevitably discovered pursuant to an inventory search of the car, which was being impounded for the registration violation.[23] (Tr. 125-26). The Court does not agree that the Government has made a sufficient showing in this regard.

Under the inevitable discovery doctrine, the government must prove, by a preponderance of the evidence, "that the police, following routine procedures, would inevitably have uncovered the evidence." *Vasquez De Reyes*, 149 F.3d at 195 (opining that "if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale [of the exclusionary rule] has so little

---

*See Brown*, 422 U.S. at 603-04 (holding that *Miranda* warnings given at a police station prior to the defendant's confession did not purge the taint of an illegal arrest that occurred less than two hours previously). Moreover, notwithstanding Officer Poleon's testimony that during the discussion regarding why and when St. Rose acquired the gun, St. Rose was "really cool, and really nice" (Tr. 15), this does not alter the Court's conclusion that the taint of the illegality was not purged by intervening events. *See id.* at 602 (observing that a confession obtained after an illegal arrest will not escape the exclusionary rule merely because it is voluntary under the Fifth Amendment "but that it [must] be sufficiently an act of free will to purge the primary taint" (quoting *Wong Sun*, 371 U.S. at 486) (quotations omitted)).

[23] Although St. Rose attacked the Government's inevitable discovery argument in its Supplemental Memorandum (Dkt. No. 42 at 30-32), the Government chose not to address the inevitable discovery doctrine in its subsequent Supplemental Response (Dkt. No. 45).

basis that the evidence should be received" (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)))
(quotations omitted); *see also Herrold*, 962 F.2d at 1140 (the doctrine "considers what would have
happened in the absence of the initial [illegal] search"). In other words, the government must show
that "the evidence would have been obtained inevitably, and therefore would have been admitted
regardless of any overreaching by the police." *Nix*, 467 U.S. at 447.

At the November Evidentiary Hearing, Officer Poleon testified that when police decide to
tow a car there is a policy requiring the officers to inventory its contents. (Tr. 22). Officer Poleon
further testified that he did in fact conduct an inventory search of the car before it was towed but
found nothing valuable. (Tr. 52-53). However, when asked on direct examination if the policy
requires a search of the car, Officer Poleon responded by stating that the policy does not require
"searching the vehicle, just visually inspecting the trunk, visually inspecting . . . where the
passengers sit [in] the vehicle." (Tr. 22).

The record does not establish the scope of the "visual inspection" to which Officer Poleon
testified. Specifically, the Court cannot determine whether the police policy requires entry into the
car and an exhaustive inspection of its contents or merely a visual scan of the trunk and passenger
areas of the car to document items that are readily visible. Of particular importance, the record is
devoid of evidence that the visual inspection of the car inevitably would have led Officer Poleon
to open the blue bag to determine its contents. Moreover, the record indicates that the occupants
of the car may have been permitted to remove items from within the car prior to the inventory
search. Specifically, Officer Poleon testified that, consistent with his routine, he asked the car's
driver whether he needed to remove any of his belongings from the car. (Tr. 11 ("Because where
the vehicle is going to be . . . [impounded] it's something that we usually do as an inventory prior
to us going with anybody's vehicle. We do an inventory, but we also ask them to remove . . .

anything valuable from the vehicle.")). It is unclear whether St. Rose would have been given this same opportunity or whether the removed belongings would, nevertheless, have been subject to inventory.

The absence of evidence on these points is significant. It has been noted that "[i]nevitable discovery is not an exception to be invoked casually, and if it is to be prevented from swallowing the Fourth Amendment and the exclusionary rule, courts must take care to hold the government to its burden of proof." *Vasquez de Reyes*, 149 F.3d at 196 (quoting *United States v. Jones*, 72 F.3d 1324, 1334 (7th Cir. 1995)) (quotations omitted). The record "must support a finding that the police had relevant procedures in place, that those procedures would have been followed, and that that would have inevitably led to the discovery of the evidence in question." *United States v. Carrion-Soto*, 493 F. App'x 340, 342 (3d Cir. 2012). It has been further noted that:

> If the officers here had appropriate procedures that would have been followed absent the unconstitutional search . . . , it was the Government's burden to establish that during the hearing. It is not for a court to speculate about any such procedures unless the facts are so clear as to justify taking judicial notice of them.

*Id.* at 343.

Here, the Government has failed to meet its burden of establishing that the visual inspection required by the police policy "would have inevitably led to the discovery of the evidence in question," *id.* at 342, and the Court will not assume facts that are not in evidence. Except for the inventory search, the Government offers no other theory as to how the bag and its contents would have been inevitably discovered. Accordingly, the Court finds that the inevitable discovery doctrine has not been shown to be applicable, and the evidence associated with the bag must be suppressed.

**d)**        **The marijuana found on St. Rose's person**

Following St. Rose's involuntary statement and illegal arrest, additional marijuana was discovered on his person both as a result of St. Rose's statements and a search Officer Poleon conducted prior to putting St. Rose in the transport unit. Similar to the bag of marijuana discovered in the car, the marijuana discovered on St. Rose is the fruit of his involuntary statement and illegal arrest and, therefore, must be suppressed.

There is sufficiently close temporal proximity between the initial illegal conduct and the discovery of the marijuana on St. Rose's person that the taint of the illegality was not purged. Similar to the timeframe for when the bag containing marijuana was discovered, the record indicates that the marijuana on St. Rose's person was, at worst, discovered no more than three and a half hours after his involuntary statements. (Defense Exh. 6(a)). Likewise, the record contains no evidence of intervening circumstances that would have purged the taint from the involuntary statement. Thus, "the totality of the circumstances establishes that the initial violation was integrally related" to the subsequent discovery of the marijuana on St. Rose's person. *Howard*, 210 F. Supp. 2d at 520.

Finally, the Government has failed to establish that any of the exceptions to the exclusionary rule are applicable. Of note, because St. Rose's arrest was illegal, there could be no valid search incident to arrest. *United States v. Myers*, 308 F.3d 251, 265-66 (3d Cir. 2002) (noting that because the officer "did not have probable cause to arrest [defendant] . . . the evidence that was seized pursuant to that arrest should have been suppressed"). Accordingly, the marijuana discovered on St. Rose must be suppressed.

### III.    CONCLUSION

For the reasons stated above, the Court will grant St. Rose's Motion to Suppress. An appropriate Order accompanies this Memorandum Opinion.

Date: April 21, 2016                                    _____/s/_____
                                                       WILMA A. LEWIS
                                                       Chief Judge